UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

CASEY VOELKL

              Plaintiff,

           v.

TOWN OF GREECE,
GREECE POLICE DEPARTMENT,
WILLIAM D. REILICH, and
MICHELLE MARINI,

              Defendants.

Case No.: 6:23-cv-06098

**FIRST AMENDED
COMPLAINT
JURY TRIAL DEMANDED**

      Greece Deputy Chief of Police **CASEY VOELKL** ("Casey Voelkl"), by and through his attorneys, Abrams Fensterman, LLP and Tully Rinckey, PLLC, as and for his First Amended Complaint against the Defendants, **TOWN OF GREECE, GREECE POLICE DEPARTMENT, WILLIAM D. REILICH,** and **MICHELLE MARINI**, alleges as follows:

**Introduction**

      1.     Twelve days before election day, Greece's Chief of Police was in a serious accident in his fleet vehicle that the Defendants intentionally hid from the public.  The accident and the Defendants' lack of transparency were brought to light when Casey Voelkl referred the matter to the Monroe County District Attorney.  Within days of his referral, Defendants commenced a campaign of retaliatory actions against Casey Voelkl for going behind their back including, but not limited to, an unlawful "demotion" of four civil service steps without any authority or due process.  Defendants' retaliation was unlawful and this action seeks the restoration of Casey Voelkl's position, designation, and benefits, as well as damages in connection with the Defendants' concerted efforts to destroy Casey Voelkl's exemplary career.

**Jurisdiction and Venue**

2.      This Court has original jurisdiction pursuant to 28 U.S.C. § 1331, because Casey Voelkl's claims arise under 42 U.S.C. § 1983 and 28 U.S.C. § 2201.

3.      The supplemental jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1367 over all other claims.

4.      Venue in this district is appropriate pursuant to 28 U.S.C. § 1391(b)(1) and (2), as all Defendants reside in this district and a substantial part of the events giving rise to the claims occurred in this district.

**The Parties**

5.      Casey Voelkl is an individual residing at 39 Evandale Road, Rochester, New York 14618.

6.      Upon information and belief, the Town of Greece ("Greece" or the "Town") is a municipal corporation, having its principal office at 1 Vince Tofany Blvd., Greece, New York 14612-5030.

7.      Upon information and belief, the Greece Police Department (the "Police Department" or the "Greece Police") is a Department of Greece with its headquarters at 6 Vince Tofany Blvd., Greece, New York 14612-5030.

8.      Upon information and belief, William "Bill" D. Reilich is an individual residing at 462 Melwood Drive, Rochester, New York 14626.

9.      Upon information and belief, Deputy Supervisor Michelle Marini is an individual residing at 232 Torrey Pine Drive, Rochester, New York 14612.

2

**Casey Voelkl**

10.     Casey Voelkl was hired by the Greece Police on July 21, 2003 and was appointed Deputy Chief on October 24, 2015.

11.     Casey Voelkl is the recipient of numerous awards, including an Officer of the Year Award, a Police Leadership Award, two Distinguished Service Awards and multiple Chief's Letters of Recognition.   Casey Voelkl was also nominated for the Medal of Valor, which is considered one of the highest honors that a police officer can receive.

12.     In 2018, the Defendants thought so highly of Casey Voelkl that he was sent to the FBI National Academy, with members making up the highest 1% of all senior law enforcement in the world.

13.     As a Deputy Chief of Police, Casey Voelkl's terms of employment were governed by Greece's Managers Handbook.

**Greece Police Command**

14.     On or about January 1, 2021, Bill Reilich selected Andrew Forsythe (the "Chief") as the Police Department's Chief, stating that he was a "model of the selfless service that we believe personifies the individual who should lead our department."

15.     At that time, the Police Department had two Deputy Chiefs – Casey Voelkl and Jason Helfer.

**The Events Surrounding the Chief's Motor Vehicle Crash**

16.     Below is a chronology of the Chief's accident and the events that followed, which includes references to the Monroe County District Attorney's Office recorded interview of Michelle Marini on October 26, 2021 at 2:00 p.m. ("Marini Interview").

*Wednesday, October 20, 2021*

17.     Upon information and belief, on the night of October 20, 2021, the Chief attended a fundraiser and was drinking alcohol.

*Thursday, October 21, 2021*

**12:55 a.m.**

18.     Upon information and belief, on October 21, 2021 at approximately 12:55 a.m., the Chief was driving in his Town issued Tahoe SUV and crashed into a guardrail after he swerved to miss a deer.   Upon information and belief, the Chief injured his head in the crash.   Upon information and belief, the Chief drove the Tahoe a few miles before it became inoperable.

19.     Upon information and belief, at around the same time of the Chief's vehicle crash, Michelle Marini received a phone call about the crash.

**1:43 a.m.**

20.     Upon information and belief, at approximately 1:43 a.m. on October 21, 2021, the Chief used his radio to ask the Greece Police to send the Sergeant on duty to his location.   At this time, Casey Voelkl was asleep at home.

21.     A Lieutenant, the third highest ranking level of the Greece Police and a member of the Greece Police's command staff, responded to the scene with another officer.

22.     Upon their arrival on the scene, Greece Police Department Policy required the Lieutenant and the patrolman to make a preliminary determination of whether a crime had been committed in connection with the crash.

**2:00 a.m.**

23.     At approximately 2:00 a.m. on October 21, 2021, Casey Voelkl received a notification call from the Lieutenant on scene.  During this and a later call, the Lieutenant told Casey Voelkl that the Chief had been in an accident, alcohol was not a factor and there was no crime to investigate.

24.     At no time during those calls did the Lieutenant tell Casey Voelkl that he needed his assistance.

25.     Casey Voelkl knew the Lieutenant to be competent, honest, trustworthy and experienced in observation and investigation. Casey Voelkl had no reason to reject his assessment that there was no crime to investigate in connection with the Chief's crash.

**2:45 a.m.**

26.     At about 2:45 a.m. on October 21, 2021, Casey Voelkl was driving to the scene when he learned that the Chief had been taken home.  Upon arrival, Casey Voelkl assisted the responding officers in their investigation of the accident until approximately 4:45 a.m.

**8:00 a.m.**

27.     Upon information and belief,  the Chief reported for duty at the Police Department at about 8:00 a.m. on October 21, 2021.

**8:30 a.m.**

28.     At about 8:30 a.m. on October 21, 2021, Casey Voelkl returned to Police Department headquarters and spoke to the Chief who told him that Bill Reilich's office had been notified of the accident.

29.     During his conversation with the Chief, Casey Voelkl told the Chief that he had ordered the responding officers to document everything thoroughly and truthfully.

**8:00 a.m. - 4:00 p.m.**

30.     Between the hours of 8:00 a.m. and 4:00 p.m. on the day of the crash, while Casey Voelkl supervised the completion of timely and thorough reports, the Chief met with Bill Reilich and Michelle Marini.

31.     Upon information and belief, during these meetings the Chief told Bill Reilich and Michelle Marini that the Town's Tahoe he was driving was totaled.

32.     Upon information and belief, the Chief also told Bill Reilich and Michelle Marini that the accident was caused by his swerving to miss a deer.

33.     Upon information and belief, the Chief also told Bill Reilich that he had some (alcohol) drinks before the accident.

34.     Upon information and belief, Bill Reilich promptly called Bob Johnson Car Dealership and told a representative or owner that the Greece Chief needed a new Tahoe.

35.     Upon information and belief, the Chief also told Michelle Marini that he had some (alcohol) drinks before the accident.

36.     In the Marini Interview, Michelle Marini was asked "has anybody in the department ever indicated to you that he (the Chief) could've been drinking that night?"  Michelle Marini responded, "No."

37.     In the Marini Interview, Michelle Marini said that she encouraged the Chief to see a doctor on October 21, 2021.

38.     Upon information and belief, Bill Reilich and Michelle Marini did not (1) arrange for the public to be informed of the accident, (2) contact any law enforcement agency or the Greece

6

Police to discuss the accident, or (3) notify the Greece Personnel Director or Human Resources that the Chief had been in an accident involving Greece property and that Michelle Marini believed he needed to see a doctor.

*Friday, October 22, 2021*

39.     Upon information and belief, in the hours following the crash and on Friday October 22, 2021, certain Greece employees were discussing the crash, the condition of the Tahoe and the failure of Bill Reilich and Michelle Marini to disclose the existence of the crash to Greece residents and the media.  Upon information and belief, one or more Greece employees believed the Defendants were involved in an improper and/or illegal cover-up.

**8:51 a.m**.

40.     At approximately 8:51 a.m. on Friday October 22, 2021, Greece Police Sergeant Bryan Root entered the impound lot and took photographs of the Chief's Tahoe.

**9:20 a.m.**

41.     At approximately 9:20 a.m. on October 22, 2021, Jason Helfer told Casey Voelkl that he was collecting the accident reports and delivering them to the Town Attorneys' Office.

**2:00 p.m.**

42.     Upon information and belief, just before 2:00 p.m. on October 22, 2021, Ginny Ryan from News Channel 13 called Greece Sergeant Jared Rene, the Police Department's Public Information Officer, and asked about the accident and whether alcohol had been a factor.

43.     Upon information and belief, Sergeant Rene received more media calls about the crash on October 22, 2021 and the Chief told him to talk to Michelle Marini about how to respond to the inquiries about the accident and alcohol.

**5:00 p.m.**

44.     Upon information and belief, at about 5:00 p.m. on October 22, 2021, Sergeant Rene called Michelle Marini and told her that reporters continued to assert that the Chief had been drinking alcohol before the crash.

45.     Upon information and belief, Michelle Marini instructed Sergeant Rene to tell the reporters to focus on the Chief's health and not what he was doing prior to the accident.

46.     In the Marini Interview on October 26, 2021, Michelle Marini was asked "has anybody in the department ever indicated to you that he (the Chief) could've been drinking that night?"  Michelle Marini responded "No."

**7:00 p.m.**

47.     Upon information and belief, at approximately 7:00 p.m. on October 22, 2021, the local media was running stories about the accident with photographs of the Chief's vehicle and specific details about the accident.

*Saturday, October 23, 2021*

**Morning**

48.     In the Marini Interview, Michelle Marini disclosed a call with Bill Reilich on the morning of October 23, 2021.  She stated that during that call:

      a.   She learned that Bill Reilich was told by a reporter that there were sparks flying from the Chief's vehicle as he drove;

8

    b.  This was first time she recognized the severity of the crash;

    c.  She made the determination that the Chief had not been forthcoming with all of the details of the crash ("he wasn't giving us everything"); and

    d.  She and Bill Reilich decided that the Chief should be put on administrative leave and that she needed the assistance of labor counsel to determine whether and how this could be accomplished.

**2:30 p.m.**

49.    Upon information and belief, on October 23, 2021, Casey Voelkl and Jason Helfer discussed their concerns about the lack of action and transparency by the Supervisor's office and an investigation of individual(s) who had accessed the impound lot where the Chief's Tahoe was located.

50.    Upon information and belief, at approximately 2:30 p.m. on October 23, 2021, as a result of the conversations between the Deputy Chiefs, Jason Helfer notified Town Attorney Brian Marianetti that the Deputy Chiefs were concerned that an outside investigation was needed and asked him to get involved.

51.    Upon information and belief, as a result of Jason Helfer's call, Town Attorney Brian Marianetti called Bill Reilich.

**3:00 p.m.**

52.    On October 23, 2021 at approximately 3:00 p.m., Jason Helfer told Casey Voelkl that Michelle Marini had spoken to him.

53.    Specifically, Jason Helfer told Casey Voelkl that Michelle Marini accused him of going behind her back and was furious that Brian Marianetti had called Bill Reilich.

54.     Jason Helfer made a contemporaneous note of this call by texting Casey Voelkl that Michelle Marini "makes me feel like I did something wrong by calling Brian."

**3:33 p.m.**

55.     At approximately 3:33 p.m. on October 23, 2021, after learning of Michelle Marini's reaction to Jason Helfer calling the Town Attorney, Casey Voelkl contacted Monroe County District Attorney, Sandra Doorley ("DA Sandra Doorley") and requested an independent investigation of the crash and Greece's response to the crash.

56.     Casey Voelkl's call was for the purpose of reporting suspected government misconduct and/or a violation of the law.

57.     After his call with DA Sandra Doorley, Casey Voelkl called Jason Helfer and told him that DA Sandra Doorley had agreed to take the investigation, a development that they believed would infuriate Michelle Marini.

58.     Casey Voelkl told Jason Helfer that he would notify Michelle Marini because it was his "turn to be yelled at."

**4:00 p.m**.

59.     At approximately 4:00 p.m. on October 23, 2021, Casey Voelkl notified Michelle Marini of his call with DA Sandra Doorley.  Michelle Marini responded that (1) Casey Voelkl needed to tell the Chief that he requested the investigation; and (2) he needed to tell DA Sandra Doorley that her press release should say that Greece requested the investigation.

60.     Michelle Marini also told Casey Voelkl that the Chief would not be placed on leave or suspended during DA Sandra Doorley's investigation.

61.     Michelle Marini told Casey Voelkl that if he wanted the Chief out of the office during the investigation, then he should call the Chief and suggest to him that he take some vacation days.

62.     After the call with Michelle Marini, Casey Voelkl memorialized the conversation with a text message to DA Sandra Doorley that stated "Jay and I suggested that the town have Drew (the Chief) take a few days off while this occurs, but it doesn't sound like they will do that. It will be very awkward with him in the office while we are working with you guys. I might suggest it to him, but if you guys agree, I'm sure it can't hurt to share that opinion with him."

63.     In the Marini Interview, Michelle Marini claimed that the decision to place the Chief on administrative leave had been made hours prior to her 4:00 p.m. call with Casey Voelkl.

***Sunday, October 24, 2021***

**10:00 a.m.**

64.     Upon information and belief, at approximately 10:00 a.m. on October 24, 2021, the Chief had a conversation with Sergeant Rene to discuss whether he should have a press conference about the accident on Monday.

**11:00 a.m.**

65.     On Sunday, October 24, 2021, at approximately 11:00 a.m., both Casey Voelkl and Jason Helfer provided statements to DA Sandra Doorley.

66.     During their meeting, DA Sandra Doorley, Casey Voelkl and Jason Helfer discussed Michelle Marini's refusal to place the Chief on leave during the investigation. DA Sandra Doorley advised that she would discuss the Chief's leave directly with Bill Reilich.

**4:00 p.m.**

67.     Upon information and belief, at or around 4:00 p.m. on that Sunday, the Chief told Sergeant Rene that he had been placed on leave.

*Monday, October 25, 2021*

68.     On October 25, 2021, eight days before the election, Bill Reilich released a statement that he had "called for" the resignation of the Chief.

69.     Upon information and belief, Defendants blamed Casey Voelkl for exposing their attempted cover-up and causing negative media attention during the final days of Bill Reilich's campaign.

70.     Upon information and belief, Bill Reilich and Michelle Marini believed that the Chief's crash could ruin Bill Reilich's re-election chances.

71.     Upon information and belief, at least one Greece official said that Bill Reilich and Michelle Marini were "sweating bullets" about the election because of the media coverage of the Chief's crash.

72.     Upon information and belief, Michelle Marini believed that but for Casey Voelkl's call to DA Sandra Doorley, the media would have moved on to a different story and the matter could have been handled internally with a meeting.

73.     Upon information and belief, the publicity surrounding the crash was so intrinsically linked to the election that the Town's labor attorney threatened Seargent Root with criminal prosecution for election interference for exposing photographs of the Chief's Tahoe.

*Tuesday, October 26, 2021*

74.     Upon information and belief, on Tuesday, October 26, 2021, and in connection with the criminal investigation into the Chief's crash, Michelle Marini was interviewed by the Monroe County District Attorney's office.

*Tuesday, November 2, 2021*

75.     On November 2, 2021, Bill Reilich was re-elected as Greece supervisor.

*Monday, November 8, 2021*

76.     Upon information and belief, after the election, the Defendants diverted time, attention, focus and resources to punishing Casey Voelkl.

77.     On November 8, 2021, Bill Reilich held a press conference.  During that press conference, he suggested that in connection with the Chief's crash, the Greece Police had ignored illegal acts because it did not know "what to do if a chief or commanding officer is discovered to be 'engaged in illegal acts or workplace misconduct.'"

78.     At the time of Bill Reilich's press conference, notwithstanding its investigation, the District Attorney's Office had not charged any member of the Police Department with criminal charges for "ignoring" illegal acts or workplace misconduct.

79.     At the time of Bill Reilich's press conference, notwithstanding its investigation, the District Attorney's Office had not brought charges against any member of the Police Department for falsifying police reports in furtherance of ignoring illegal acts or workplace misconduct.

80.     On the same day of the press conference, Casey Voelkl received a letter with the subject line: "Re: "Immediate Suspension."  The letter stated that "a Special Deputy Chief for Internal Affairs has been selected to be appropriately deputized for the purpose of conducting an

internal investigation into the Greece Police Department ("GPD")" involving a review of the circumstances around Chief Forsythe's crash." The letter went on to state "[y]ou are directed to surrender your badge, ID, tools, equipment, any and all Department issued technological devices, including but not limited to your laptop, computer, phone, and any other items provided to you, immediately upon receipt of this letter, if you have not already done so.  You are also directed to surrender your department firearms.  To preserve the integrity of the investigation you will be walked out of the GPD immediately, you may not remove any documents or perform any work whatsoever before your departure."

81.    Casey Voelkl was escorted from the Police Department and suspended.

82.    Upon information and belief, the timing of the press conference and Casey Voelkl's suspension was orchestrated to provide the perception that Casey Voelkl had "ignored illegal acts or workplace misconduct."

83.    Defendants' actions constituted retaliation against Casey Voelkl for asking DA Sandra Doorley to investigate the matters surrounding the vehicle accident.

**The Morabito Report**

84.    At taxpayer cost, the Defendants caused Greece to hire Joseph Morabito "to investigate" the police officers.

85.    The Town Board authorized Mr. Morabito to issue disciplinary charges against Greece police officers "no later than Monday, December 20, 2021."

86.    Upon information and belief, these efforts were orchestrated to create a narrative that it was police officers who participated in some kind of cover-up worthy of disciplinary charges, as opposed to official(s).

87.     Upon information and belief, Mr. Morabito's investigation consisted largely of interviews with Police Department employees.

88.     Upon information and belief, not only was the direction of this "investigation" defined by the officials who engineered the cover-up, but their representatives were allowed to actively participate in the investigation including, but not limited to, electronically sending questions to be asked by the investigator(s) during witness interviews.

89.     Upon information and belief, this interference was intended to intimidate witnesses and control the outcome of the alleged investigation.

90.     Upon information and belief, a draft of the Morabito Report was provided to the Defendants and/or their representatives to allow them to revise the content.

91.     Upon information and belief, Michelle Marini either saw a draft of the Morabito Report or was told about the contents of the draft.

92.     Upon information and belief, Michelle Marini and Bill Reilich discussed the draft and necessary revisions to the Morabito Report on speakerphone in the presence of a third party.

93.     Upon information and belief and for example, Michelle Marini told Bill Reilich that the draft of the Morabito Report had to be revised because it painted Jason Helfer "as a total idiot" and he had already been offered the position of Personnel Director.

94.     Upon information and belief, during the same call Michelle Marini told Bill Reilich that they had the ability to revise the Morabito Report to say what they wanted because "we are paying for them (the investigators)."

95.     Forty-two days after his appointment, the following documents were purportedly drafted by the investigator Joseph Morabito:

a. An eight-page undated and unsigned "Summary of Investigation" that contains no document identification number in the left-hand corner.

b. A twenty-one-page single-spaced document titled "Disciplinary Charges Pursuant to Section 155" dated December 20, 2021, with a document identification number in the left-hand corner 4866-9554-6375, v. 2.  This document ends approximately half-way through page 20, with Mr. Morabito's orphan signature on page 21 (the "Notice of Charges").

96.     The Morabito Report found fault with nearly every employee of the Greece Police Department who had first-hand knowledge of the accident, with the harshest charges levied at the officers who took actions to prevent a cover-up.

97.     The Morabito Report was replete with inaccurate and unsubstantiated allegations, as well as conclusory theories.

98.     All of these actions were retaliation for Casey Voelkl's protected activity of contacting DA Sandra Doorley.

**Defendants' Unlawful Demotion of Casey Voelkl**

99.     One or more of the Defendants created an internal Police Department memorandum that stated that effective December 21, 2021, Casey Voelkl was "temporarily assigned as Patrol Officer from Deputy Chief of the Operations Bureau effective immediately."

100.    The change from the title "Deputy Chief" to "Patrol Officer" would constitute a four civil rank demotion, an action that could not be effectuated by an internal Police Department memorandum  under New York Civil Service Law.

101.    Along with that title change, Defendants instituted a pay cut and change in benefits reflective of the title change that could not legally be effectuated by an internal Police Department memorandum under New York Civil Service Law.

102.    On December 21, 2021, Greece's labor counsel Karlee Bolaños emailed the Notice of Charges to Casey Voelkl's attorney, Eugene Welch.

103.    The Notice of Charges was dated December 20, 2021, and indicated that it had been sent "VIA IN PERSON DELIVERY."

104.    The Notice of Charges was never personally delivered to Casey Voelkl.

105.    The Notice of Charges was not received by Casey Voelkl in any form until the December 21, 2021 email from Karlee Bolaños to Eugene Welch.

106.    In the Notice of Charges, Mr. Morabito purportedly offered Casey Voelkl the Hobson's choice of an unprecedented demotion to Patrol Officer or termination after the activation of disciplinary charges.  At this time, Casey Voelkl was approximately one year away from his pension fully vesting and had he been fired, he would not have received his full pension.

107.    The Notice of Charges provided that the charges "are not going to be processed for a hearing by the Town at this time."

108.    The Notice of Charges further stated that the "Town disagrees with your position [that the demotion was disciplinary and required the Town Law § 155 process]."

109.    The Notice of Charges was invalid because, among other reasons, under applicable law it was not timely presented to Casey Voelkl, and it stated that charges were "not activated."

110.    Casey Voelkl did not accept his demotion or waive his rights to challenge the demotion, and Greece did not attempt to activate charges and proceed to a hearing.

111.    Casey Voelkl reported to work at the Police Department on December 21, 2021, as ordered, and performed the duties of a Patrol Officer which were assigned to him.

112.    Casey Voelkl filed a timely Notice of Claim against the Defendants.


**Additional Retaliation After the Unlawful Demotion**

113.    Defendants' retaliation did not end with sending Casey Voelkl back to patrol and continued after he filed a Notice of Claim.

114.    On or about March 11, 2022, Greece Personnel Director Keith Suhr sent a letter to the NYS Division of Criminal Justice Services, the agency that certifies police officers in New York.  In this letter, Keith Suhr purportedly sought documentation about Casey Voelkl from the years 2017 and 2018 in furtherance of his "maintenance of all personnel files for Town Employees."

115.    In that letter, Mr. Suhr claimed that Casey Voelkl had "potentially cheated on a fingerprint examination" in 2017, a year before Greece had found Casey Voelkl to be of such high moral character that it sent him to the FBI academy.

116.    This letter which impugned Casey Voelkl's integrity was sent to the agency that certified Casey Voelkl as a police officer in New York.

117.    Upon information and belief, this was intended as additional retaliation and an effort to discredit Casey Voelkl after he filed his Notice of Claim.

118.    At this time and as a result of the continuing and vicious retaliation, Casey Voelkl lived in constant fear that the Defendants would fabricate an excuse to fire him and take away his full pension.

119.    Unable to live with the constant fear of additional and worsening retaliation, on or about May 15, 2023, Casey Voelkl notified Greece Personnel Director Keith Suhr and Greece Chief of Police Michael Wood that he would be retiring, effective May 31, 2023.

120.    The Town of Greece Managers Handbook, which applies to the Deputy Chief position, entitles Casey Voelkl to the benefit of retiree lifetime health insurance.

121.    In his May 15, 2023 correspondence, Casey Voelkl requested to be enrolled in the Town's healthcare plan in retirement, as provided for in the Managers Handbook. Casey Voelkl also requested a verification of his calculation of accrued time that would be "paid out" upon his retirement.

122.    In response, on May 17, 2023, while Casey Voelkl was home recovering from surgery, Defendants sent two uniformed Greece police officers to his home to deliver a letter signed by Keith Suhr.

123.    Upon information and belief, this "show of force" was intended to intimidate and harass Casey Voelkl.

124.    That letter stated:

a. Defendants' demotion of Casey Voelkl was "a merciful act that benefited you immensely,"

b. Casey Voelkl's request to be enrolled in retirement healthcare was "not appropriate and appears perfidious,"

c. Casey Voelkl was "eligible to participate in the benefits available to retired Police Officers from the Town,"

      d.   Casey Voelkl could "elect to activate the disciplinary charges filed against you on December 20, 2021 and elect to proceed with a hearing pursuant to Town Board Resolution #408," and

      e.   "If you fail to respond regarding your option to elect a hearing, you will be deemed to have affirmatively waived your right to a hearing and will also be deemed to have accepted the demotion from Deputy Chief to Police Officer effective December 21, 2021."

125.    As stated above, Defendants did not, in fact, file disciplinary charges against Casey Voelkl on December 20, 2021.  They attempted to provide Casey Voelkl with untimely notice on December 21, 2021, and specifically stated in that "notice" that the charges were not effectuated.

126.    The Personnel Director's letter also failed to respond to Casey Voelkl's request for confirmation of accrued time.

127.    Keith Suhr's May 17, 2023 letter also referenced an enclosed "Personnel Order" purportedly reflecting Casey Voelkl's demotion from Deputy Chief to Police Officer, which was not actually included in the envelope.

128.    Keith Suhr's May 17, 2023 letter was an improper and ineffective attempt to resurrect disciplinary charges against Casey Voelkl that were not timely filed by the Town, and to deny Casey Voelkl the retirement benefits which he had earned and to which he was entitled.

129.    Upon information and belief, the May 17, 2023 letter and denial of healthcare coverage was motivated by Defendants' continued desire to punish Casey Voelkl for calling the District Attorney's Office, cooperating with their investigation, and filing a Notice of Claim and Complaint.

130.    On May 18, 2023, Casey Voelkl responded to Keith Suhr, requesting a copy of the missing enclosure and stating, "with a full reservation of my rights, I elect to participate in the Town of Greece sponsored healthcare family plan afforded to Greece Police Department UPA retirees …"

131.    On May 19, 2023, Keith Suhr sent another letter to Casey Voelkl stating "[t]he Town does not recognize self-declared reservation of rights," and "based on your refusal to elect a hearing, you will be deemed to have affirmatively waived your right to a hearing."

132.    Furthermore, despite his earlier representation that Casey Voelkl was "eligible to participate in the benefits available to retired Police Officers from the Town," Suhr now claimed that Casey Voelkl could not enroll in the health insurance plan for UPA members, either before or after his retirement.

133.    The May 19, 2023 correspondence included a copy of the missing enclosure referenced in Mr. Suhr's May 17, 2023 letter.

134.    The enclosure is a memorandum purportedly issued on December 21, 2021, assigning Casey Voelkl "to 2nd Platoon Road Patrol effective December 27, 2021."

135.    May 19th, 2023 was the first time Casey Voelkl saw this 2021 memorandum.

136.    On February 9, 2022, Casey Voelkl had issued a FOIL request for, among other things, his personnel file.  Greece's response in or around June 2022 did not include the "Personnel Order" dated December 21, 2021 that was provided to Casey Voelkl on May 19, 2023.

137.    Keith Suhr's May 19, 2023 letter was an additional attempt to retroactively justify Defendants' unlawful demotion of Casey Voelkl, gain strategic advantage in litigation, and further retaliate against Casey Voelkl by denying him not only his benefits according to his rightful position, but also benefits under the position to which Defendants purportedly demoted him.

138.    After Casey Voelkl's notice on May 15, 2023 that he intended to retire, Defendants scrambled to discredit and further retaliate against him.

139.    The Greece Police Department typically gives annual performance evaluations of officers on or after the anniversary of their start date.

140.    Casey Voelkl's start date with the Greece Police was July 21, 2003.

141.    As such, Casey Voelkl's annual evaluations were performed on or after July 21st each year.

142.    On or about May 25, 2023 and following his notice of retirement, Casey Voelkl was notified that the Chief of the Police Department had ordered an annual evaluation of him even though it would be off schedule.

143.    Upon information and belief, during the nearly 20 years that Casey Voelkl had been with the Police Department, a Chief had never ordered a premature evaluation to be completed on an officer within a week of his announced retirement.

144.    Upon information and belief, the command to accelerate Casey Voelkl's annual evaluation was for the improper purpose of retaliation.

145.    Casey Voelkl's evaluation was presented to him on May 29, 2023, two calendar days before his retirement.

146.    Casey Voelkl's evaluation was outstanding.

147.    However, Casey Voelkl received a 2/5 rating for "Attendance," based on the time he was out sick due to his shoulder injury and surgery.

148.    Upon information and belief, the Chief of the Police Department ordered a Sergeant to issue a counseling memo to Casey Voelkl reprimanding him for his use of sick time.

149.    As stated in the Police Department's Procedure 500, a "counseling memorandum is a formal way of documenting a counseling or training session and the corrective actions taken or planned to be taken."

150.    Here, there was no counseling or training session to be documented.

151.    Moreover, upon information and belief, this counseling memorandum was not even drafted until after Casey Voelkl retired.

152.    Not only was a counseling memorandum unprecedented, against policy and unwarranted, its sole purpose was to harass, intimidate and injure Casey Voelkl.

153.    The rushed evaluation and baseless counseling memo were additional attempts to retaliate against and discredit Casey Voelkl.

154.    On May 31, 2023, Casey Voelkl's forced retirement from the Police Department became effective.

**Procedural History, Damages and Relief Sought**

155.    The Defendants engaged in retaliatory acts against Casey Voelkl in violation of law, including, but not limited to the New York State Civil Service Law as well as in violation of Casey Voelkl's constitutional rights, and his right as a citizen to bring corruption within Greece to the attention of governmental bodies.  The retaliatory acts against Casey Voelkl have caused him pain, suffering and pecuniary damages.

156.    Defendants' actions constitute retaliation against Casey Voelkl for being a whistleblower, and are prohibited by, among other laws, Section 75-b of the New York State Civil Service Law.  In addition, they constitute retaliation for his filing a Notice of Claim and lawsuit concerning his whistleblowing.

157.    Casey Voelkl timely filed a Notice of Claim on or about February 4, 2022, identifying claims against the Defendants based on the facts outlined therein, including the facts detailed in this First Amended Complaint.

158.    Defendants waived their opportunity to conduct a hearing pursuant to Civil Service Law 50-h.

159.    As a direct and proximate result of the Defendants' retaliatory actions, Casey Voelkl suffered pecuniary injuries, emotional injuries, and injuries to his stellar reputation.

160.    The four-step "demotion" suffered by Casey Voelkl was shocking and severe.

161.    Defendants' actions have caused Casey Voelkl to lose compensation to which he was entitled, use of a fleet vehicle, and he suffered losses to his reputation, health and his career. His wages and benefits were reduced and his opportunity for promotion or similar employment decreased, all of which also has an impact on his pension.

162.    Defendants' actions forced Casey Voelkl to retire earlier than he had planned, depriving him of additional future compensation and opportunities for advancement.

163.    As a direct and proximate result of the continuous actions and omissions of the Defendants, Casey Voelkl suffered retaliation, improper reassignment, and other adverse personnel action(s) prohibited by law, as well as other physical, mental and emotional ailments.

164.    As a proximate and direct result of Defendants' conduct toward him, Casey Voelkl has been stressed, anxious, nervous, scared, and unable to sleep.

165.    Based on the foregoing, Casey Voelkl demands relief for his damages including loss of past and future wages, holiday pay, accrual of paid time off, pension contributions, credited service time for purposes of pension contributions, lost benefits, lost wages as a result of being deprived of promotions, credited service time for purposes of seniority, longevity pay, as well as

pain and suffering, along with interest and attorney's fees, along with restoration and reinstatement to his permanent Civil Service position as Deputy Chief, and restoration and reinstatement of his compensation and benefits.  Casey Voelkl also seeks his accrued and unpaid PTO time and enrollment into the lifetime health insurance benefit he earned after two decades of service to Greece.

166.    Casey Voelkl was deprived of his due process rights by Defendants' actions under the color of state law.

167.    As a tenured, permanently appointed Deputy Chief, Casey Voelkl was entitled to notice and an opportunity to respond before being suspended or demoted or removed from that position, including but not limited to written notice of the charges, an explanation of the employer's evidence, and the opportunity to present his side of the story.

168.    As a tenured, permanently appointed Deputy Chief, Casey Voelkl was entitled to a post-suspension and demotion hearing, and no post-suspension hearing was ever provided, let alone promptly scheduled.  Since his suspension, he has never been restored to his permanent Deputy Chief position, and his lost wages, benefits and other losses have never been restored.

169.    Despite due demand, Casey Voelkl was denied due process, including his right to a public hearing.

170.    As set forth above, Defendants unlawful and improper campaign of retaliation against Casey Voelkl had its intended effect of ruining his mental well-being and distinguished career in law enforcement.

**FIRST CAUSE OF ACTION**
**(Declaratory Judgment Declaring that Casey Voelkl's Rank and Benefits Have Not Changed and Continue as Deputy Police Chief and Reinstating and Restoring His Rank, Compensation, Benefits and Seniority)**

171.     Casey Voelkl repeats and realleges each and every preceding allegation as if fully set forth herein.

172.     Casey Voelkl repeats and realleges each and every preceding allegation as if fully set forth herein.

173.     This is a claim under 28 U.S.C. § 2201 seeking a declaratory judgment.  Casey Voelkl seeks a declaration that he retains the rank of Deputy Chief and Defendants' suspension and demotion of him to the rank, compensation and benefits of patrol officer is invalid, void and unenforceable.

174.     Casey Voelkl also seeks a permanent injunction barring the Defendants from demoting Casey Voelkl from his Deputy Chief position or disciplining him in relation to the Chief's accident and his request that the Monroe County District Attorney's office investigate, along with such other and further relief as the Court may deem just and appropriate.

175.     New York State Civil Service Law, New York State Town Law § 155 ("Town Law § 155") and Greece Town Resolution #408 of 2013 ("Greece Resolution #408) guaranteed Casey Voelkl due process before he could be removed from his permanent Civil Service position of Deputy Chief, and before his compensation and benefits could be decreased or taken away.

176.     Defendants' suspension and demotion of Casey Voelkl violated Town Law § 155.

177.     Defendants suspended Casey Voelkl without serving charges in violation of Town Law § 155.

178.     Casey Voelkl was reprimanded, removed and/or dismissed from office without written charges being examined, heard, and investigated, in violation of Town Law § 155.

179.    Defendants demoted Casey Voelkl four civil service steps, a penalty which is not permitted by Town Law § 155.

180.    Defendants did not serve written charges within sixty days of the town board's knowledge of the facts on which the charges were based, in violation of Town Law § 155.

181.    Defendants' suspension and demotion of Casey Voelkl violated Greece Resolution #408.

182.    Defendants suspended Casey Voelkl without serving disciplinary charges in violation of Greece Resolution #408.

183.     Defendants demoted Casey Voelkl four civil service steps, a penalty which is not permitted by Greece Resolution #408.

184.    Defendants did not serve written charges within sixty days of the town board's knowledge of the facts on which the charges were based, in violation of Greece Resolution #408.

185.    Defendants did not serve the written charges by personal service or U.S. regular and certified mail, in violation of Greece Resolution #408.

186.    Resolution #302 of the Greece Town Board on December 16, 2021, granted, "Authorization, pursuant to Town Resolution #408 of 2013, to designate and authorize Joseph Morabito, Special Deputy Chief of Internal Affairs to prefer disciplinary charges against sworn members of the Greece Police Department, and further directing Special Deputy Chief Morabito to issue the charges by no later than Monday, December 20, 2021."

187.    Defendants did not issue charges until December 21, 2021.

188.    Defendants' untimely "Notice of Charges" referenced above denied activating charges and stated that the matter did not constitute discipline and would not proceed to a hearing.

189.    The Notice of Charges was ineffective and invalid.

190.   Casey Voelkl never consented to the demotion or waived his rights to due process before he could be deprived of his permanent position, compensation and benefits as Deputy Police Chief of the Town of Greece.

191.   If the Town Law and Greece Resolution did not apply to the actions taken against him, Casey Voelkl was entitled to the protections of the New York State Civil Service Law, which only authorizes a demotion in pay or title after a covered employee is found guilty of charges, following compliance with the required due process protections.

192.   The Defendants never brought charges against Casey Voelkl pursuant to New York State Civil Service Law § 75.

193.   Casey Voelkl has never been found guilty of any charges.  As a result, and under all of the applicable law cited above, he is entitled to reinstatement to Deputy Chief, with full pay and benefits from the date of suspension forward pursuant to Town Law § 155.

**SECOND CAUSE OF ACTION**
**(42 U.S.C. § 1983 Deprivation of Rights Under Color of Federal and State Law as Against All Defendants)**

194.   Casey Voelkl repeats and realleges each and every preceding allegation as if fully set forth herein.

195.   This is an action for deprivation of constitutional rights under color of state law brought pursuant to 42 U.S.C. § 1983, for remedies for Defendants' deprivation of Casey Voelkl's civil rights.

196.   Greece is, and was at all times mentioned, a public entity, operating as an extension of the State of New York in providing police services in Greece.  The Police Department was a Department of Greece, and Bill Reilich and Michelle Marini purported to be agents of Greece and to act in concert with these public entities. The Defendants were acting under color of their

authority and, as such, under color of the statutes, ordinances, regulations, customs, and usages of New York State and Greece.

197.    Casey Voelkl was a public employee with a permanent Civil Service position, and as such, could not be demoted or removed from that position without due process.

198.    By reason of the Defendants' conduct, Casey Voelkl was deprived of rights, privileges, and immunities secured by the Constitution of the United States and laws enacted under that Constitution, and the Constitution and laws of the State of New York.

199.    Casey Voelkl has been deprived of liberty and property interests without the minimal protections of due process guaranteed under the United States Constitution.

200.    The Defendants conspired to take action against Casey Voelkl in secret and deprive him of rights.  Their acts have, for now, destroyed Casey Voelkl's mental well-being and career prospects.

201.    The United States Supreme Court has consistently maintained that both property and liberty interests are protected by the Fourteenth Amendment of the United States Constitution.

202.    Casey Voelkl had and has a property interest in his continued employment as Deputy Chief of the Greece Police.

203.    Casey Voelkl had and has a liberty interest in his good name, reputation, honor and integrity.

204.    The good name, reputation, honor, and integrity of Casey Voelkl have been compromised and damaged by the conduct of Defendants.

205.    Defendants took concerted actions to discredit Casey Voelkl and destroy his career.

206.    Nothing will ever restore Casey Voelkl to the good reputation he had before Defendants engaged in the inappropriate conduct referenced herein.

207.    As a proximate result of Defendants' actions against Casey Voelkl, he has been harmed, in that he has lost his Deputy Chief job and title, has sustained and will sustain monetary losses during the period of absence from his position that would have been earned as a part of his compensation and benefits, and will lose income from future years that he would have been Deputy Chief but for the actions of the Defendants.

208.    Casey Voelkl was constructively discharged by the Defendants' continued attacks on his career.

209.    The injury to Casey Voelkl includes emotional and mental distress, physical upset, and physical injury, all constituting general damages in an amount to be determined at trial.

210.    As a further proximate result of the actions of the Defendants, and Defendants' intentional deprivation of Casey Voelkl's liberty, Casey Voelkl has suffered damage to his good name, reputation, honor, and integrity.

211.    As a further proximate result of the actions of the Defendants, Casey Voelkl has been required to retain the services of attorneys to protect his interests, and Casey Voelkl will be responsible for the fees and costs incurred through that representation.

212.    The above actions of the Defendants, and each of them, in depriving Casey Voelkl of his constitutionally protected rights were done with malicious motive or intent, or with reckless or callous indifference to his rights.

213.    Casey Voelkl seeks all legal and equitable relief to which he may be entitled, including, but not limited to compensatory and punitive damages, attorney's fees and costs, prejudgment interest, and injunctive relief against all Defendants.

### THIRD CAUSE OF ACTION
### (Retaliation for Exercising Freedom of Speech
### Violation of 42 U.S.C. § 1983 as Against All Defendants)

214.     Casey Voelkl repeats and realleges each and every preceding allegation as if fully set forth herein.

215.     Pursuant to Article 1, Section 8 of the New York State Constitution and the First Amendment to the United States Constitution, every citizen may freely speak, write or publish their thoughts as it relates to matters of public concern.

216.     Defendants, acting as State representatives, violated Casey Voelkl's First Amendment rights by retaliating against him for exercising his freedom of speech as a citizen with regard to a matter of public safety and concern by reporting possible criminal conduct on the part of Chief Forsythe and unethical, illegal and corrupt practices by the Defendants in attempting to cover it up, by requesting that the Monroe County District Attorney's office conduct an investigation and by requesting that the Chief be suspended or placed on administrative leave while the investigation was conducted.

217.     As a direct and proximate result of Defendants' retaliatory actions against Casey Voelkl, he has suffered and continues to suffer a loss of past and future income, monetary damages, humiliation, severe emotional distress, mental and physical anguish and suffering, and damages to his professional reputation, in an amount to be determined by a trier of fact.

218.     Defendants, acting as State representatives, violated Casey Voelkl's First Amendment rights by retaliating against him for exercising his freedom of speech as a citizen with regard to a matter of public safety and concern by reporting the aforesaid practices and conduct.

219.     Defendants' actions constitute a violation of Casey Voelkl's rights under the United States Constitution and the New York State Constitution.

220.     As a career public servant, Casey Voelkl had the legitimate expectation to remain in the position to which he had been promoted (and from which he was demoted by Defendants),

and that Casey Voelkl could not be removed or demoted from that position except for cause. Defendants deny disciplining him, let alone removing him from his position for cause.

221.    Defendants knew, or should have known, that removing Casey Voelkl from his supervisory position and demoting him because of his protected statements was a violation of Casey Voelkl's rights under the United States Constitution and under the New York State Constitution.

222.    The Defendants acted maliciously, willfully, and in wanton and reckless disregard of Casey Voelkl's constitutional rights when they took the action, in violation of Casey Voelkl's civil rights, as provided in 42 U.S.C. § 1983.

223.    As a result of the foregoing, Casey Voelkl must be restored and reinstated to his Deputy Chief position, with back pay and benefits, prejudgment interest, additional compensation for all damages, and attorney's fees.

**FOURTH CAUSE OF ACTION**
**(Violation of Civil Service Law § 75-b**
**As Against Greece and the Police Department)**

224.    Casey Voelkl repeats and realleges each and every preceding allegation as if fully set forth herein.

225.    Civil Service Law § 75-b states, in pertinent part that "a public employer shall not dismiss or take other disciplinary or other adverse personnel action against a public employee regarding the employee's employment because the employee discloses to a governmental body information: (i) regarding a violation of a law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety; or (ii) which the employee reasonably believes to be true and reasonably believes constitutes an improper governmental action."

226.    At all times relevant, Casey Voelkl was a public employee covered under Civil Services Law § 75-b.

227.    At all times relevant, the Town and the Greece Police Department were public employers covered under Civil Services Law § 75-b.

228.    At all times relevant, the Monroe County District Attorney's office was and is a governmental body within the meaning of Civil Service Law § 75-b.

229.    On or about October 23, 2021, Casey Voelkl disclosed to the Monroe County District Attorney's Office a violation of a law, rule or regulation which violation created and presented a substantial and specific danger to the public health or safety; and/or which Casey Voelkl reasonably believed to be true and reasonably believed constituted an improper governmental action, namely, Defendants' response to the Chief's accident.

230.    Defendants, jointly and severally and as agents of each other, conspired to and did take adverse disciplinary and personnel action against Casey Voelkl because he disclosed the aforesaid information to a governmental body.

231.    As a direct and proximate result of Casey Voelkl's protected disclosures, the Defendants bypassed him for appointment to the position of acting Chief and Chief, demoted and reassigned him, issued a negative evaluation of his performance contained in the Morabito Report, and engaged in other adverse action affecting his permanent appointment as Deputy Chief and his compensation.

232.    As a direct and proximate result of Defendants' retaliatory actions, Casey Voelkl has suffered and continues to suffer personal injuries and economic damages in an amount to be determined by a trier of fact.  In addition, Casey Voelkl is entitled to reinstatement to his Deputy

Chief position, and restoration and reinstatement of all losses, including but not limited to compensation and benefits.

233.    In addition, pursuant to New York Civil Service Law § 75-b, Casey Voelkl is entitled to the recovery of reasonable attorneys' fees.

### FIFTH CAUSE OF ACTION
**(Intentional Infliction of Emotional Distress as Against All Defendants)**

234.    Casey Voelkl repeats and realleges each and every preceding allegation as if fully set forth herein.

235.    Defendants, individually and jointly, conspired to punish Casey Voelkl for revealing the Chief's accident and Defendants' attempts to cover up the seriousness of his crash in October 2021.   Simply, Defendants conspired and directed that Casey Voelkl be made the scapegoat to divert the blame and to punish him for requesting a governmental investigation of the incident and the Defendants' inaction and omissions during a contested election.

236.    Defendants intentionally and willfully engaged in a pattern of conduct against Casey Voelkl which is so outrageous in character and so extreme in degree, as to go beyond all bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society.

237.    Defendants defined the boundaries of the Morabito Report which did not address their complicity, and then dictated the results to deflect attention from their inaction and punish Casey Voelkl.

238.    Upon information and belief, Defendants dictated the Morabito Report to punish Casey Voelkl so that no other person would ever again dare to expose Defendants' misconduct.

239.    To increase the outrageousness of the conduct, Defendants also conspired to deprive Casey Voelkl of legal protections which otherwise would have protected him from the

outrageous conduct, by claiming that he was not being "disciplined" but was just being temporarily reassigned.

240.    This subterfuge, along with the demotion and other punishments, constituted extreme and outrageous conduct, and the Defendants intended to cause severe emotional distress to Casey Voelkl and/or disregarded the substantial possibility of causing it.

241.    As a proximate result of these outrageous and extreme acts, including but not limited to demoting Casey Voelkl by four Civil Service ranks and depriving him of his management position, compensation, etc., and making false and inappropriate statements and allegations about him intending to ruin his career, Casey Voelkl suffered and continues to suffer severe emotional distress.

242.    Defendants continued to retaliate against Casey Voelkl by publicly suggesting he was a cheater and placing improper memorandums in his personnel file.

243.    Among the injuries caused by Defendants' conduct, Casey Voelkl suffered anxiety, sleeplessness, and other mental and physical injuries.

244.    As a direct and proximate result of the intolerable conditions fostered by Defendants, Casey Voelkl has suffered and continues to suffer emotional damage in an amount to be determined by a trier of fact.

245.    The continuous acts and omissions of Defendants directly and proximately resulted in Casey Voelkl suffering from mental anguish and severe emotional distress.

246.    The distress caused by Defendants was so severe that Casey Voelkl was compelled to, did seek and continues to seek medical treatment for his distress.

**SIXTH CAUSE OF ACTION**
**(Intentional Interference with Prospective Economic Advantages—As Against All Defendants)**

247.    Casey Voelkl repeats and realleges each and every preceding allegation as if fully set forth herein.

248.    The Defendants, by their actions as described above, intentionally caused Casey Voelkl to suffer future economic harm, including the loss of future income, pension, and other benefits.

249.    Defendants intentionally sought to violate the rights of Casey Voelkl with full knowledge of the damage their acts would do to Casey Voelkl's reputation and earning potential.

250.    Defendants intended to damage Casey Voelkl, and as a proximate result of the actions of the Defendants, Casey Voelkl has sustained the damages set forth herein.

### SEVENTH CAUSE OF ACTION
**(Breach of Contract – As Against Greece and the Police Department)**

251.    Plaintiff repeats, reiterates and realleges the previous paragraphs as though more fully set forth herein.

252.    As part of Casey Voelkl's benefit package with Greece under the Manager's Handbook, as consideration for his work, he was entitled to lifetime retiree health insurance, without reservation or discretion.

253.    This agreement constitutes an enforceable contract.

254.    Casey Voelkl opted to enroll in the health insurance during the next enrollment period before he retired, and Keith Suhr, at the direction of the Defendants, denied him his right, stating that he no longer qualified for the benefit.

255.    Greece and the Greece Police Department, jointly and severally, breached their contract with Casey Voelkl by failing and refusing to allow his enrollment in the earned and promised retiree health care pursuant to Greece's Managers Handbook.

256.    Upon retirement, Greece and the Greece Police also failed to pay Casey Voelkl his unused, accrued PTO time.

257.    In view of the foregoing, Casey Voelkl is entitled to damages in an amount to be determined at trial and/or a declaration awarding Casey Voelkl retiree health care and the value of his accrued PTO time.

**WHEREFORE**, Casey Voelkl respectfully requests judgment as follows:

A.    Damages in the form of loss of past wages, pensions contributions, lost wages as a result of being deprived of promotions, future wages, as well as pain and suffering in an amount not less than $2,000,000.

B.    Special damages in an amount according to proof at the time of trial;

C.    Punitive or exemplary damages in an amount according to proof at the time of trial;

D.    Statutory civil penalties as allowed in the causes of action set forth above;

E.    Costs of suit;

F.    Reasonable attorney's fees;

G.    Prejudgment and post judgment interest.

H.    Declaratory and Injunctive relief, including reinstatement of Casey Voelkl to his position as Deputy Chief of Police;

I.    Declaratory and Injunctive Relief enrolling Casey Voelkl into the Greece Manager's retiree insurance; and

J.    Such other and further relief as the court deems proper.

Dated: Rochester, New York
August 25, 2023

                                          Respectfully Submitted,


                                      __/s/Maureen T. Bass__
ABRAMS FENSTERMAN, LLP
Maureen T. Bass
Sharon P. Stiller
Alexander Fantuzzo
2280 East Avenue, First Floor
Rochester, New York 14610
Phone: (585) 218-9999
Mbass@abramslaw.com
SStiller@abramslaw.com
afantuzzo@abramslaw.com
*Attorneys for Casey Voelkl*



                                      __/s/ Eugene Welch__
TULLY RINCKEY, PLLC
Eugene Welch, Esq.
400 Linden Oaks
#110
Rochester, New York 14625
Telephone: (585) 899-1458
Ewelch@tullylegal.com
*Attorneys for Casey Voelkl*